# EXHIBIT 1

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

| | |
|---|---|
| L.D.1. and L.D.2, MINORS, BY NICOLE PETERSON AND THOMAS DUONG )<br><br>Plaintiffs, )<br><br>v. )<br><br>WANABANA LLC and WANABANA USA LLC, DOLLAR TREE STORES, INC., and JOHN DOE CORPORATIONS 1-10. )<br><br>Defendant(s). ) | Civil Action No. _____ |

**COMPLAINT**

Plaintiffs L.D.1 and L.D.2, minors ("Minor Children"), by Nicole Peterson and Thomas Duong, individually and as natural guardians and next friends (hereinafter collectively referred to as "Plaintiffs"), file this complaint against WanaBana LLC, WanaBana USA LLC (hereinafter referred to as "WanaBana Defendants"), John Doe Corporations 1-10 (hereinafter "John Doe Parties"), and Dollar Tree Stores, Inc. (hereinafter as "Dollar Tree;" all collectively referred to as "Defendants") for personal injuries and damages sustained as a result of L.D.1 and L.D.2's respective ingestions of lead contained in WanaBana Defendants' WanaBana Apple Cinnamon Fruit Puree (hereinafter referred to as "Products"), and sold by Dollar Tree. Plaintiffs' allegations are made upon their personal knowledge, acts and experiences and, as to all other matters, upon information and belief.

**NATURE OF THE ACTION**

1. Plaintiff Nicole Peterson is the natural mother of L.D.1, a minor.

2. Plaintiff Nicole Peterson is the natural mother of L.D.2, a minor.

1

3.   Plaintiff Thomas Duong is the natural father of L.D.1, a minor.

4.   Plaintiff Thomas Duong is the natural father of L.D.2, a minor.

5.   Plaintiff L.D.1 consumed Defendants' Products and suffered catastrophic life-long injuries, including lead poisoning that will require continued medical monitoring, as a result of her consumption of Defendants' lead-contaminated Products.

6.   Plaintiff L.D.2 consumed Defendants' Products and suffered life-long injuries, including lead poisoning that will require continued medical monitoring, as a result of his consumption of Defendants' lead-contaminated Products.

7.   The WanaBana Defendants design, manufacture, distribute, test, package, label, promote, market, advertise, distribute, and provide for sale fruit puree "pouches," including the lead-contaminated apple cinnamon Products at issue here, throughout the United States.

8.   The Dollar Tree Defendant is a retailer and seller of the WanaBana Defendants' fruit puree pouches, including the lead-contaminated cinnamon apple Products.

9.   Defendants are each liable to Plaintiffs for the injuries Plaintiffs have suffered by virtue of the doctrine of joint and several liability. Further, as alleged herein, Defendants worked and work in tandem to sell the Products.

## THE PARTIES

### *Plaintiffs*

10.   Plaintiffs Nicole Peterson and Thomas Duong are a married couple who, along with their Minor Children, L.D.1 and L.D.2, are citizens and residents of Hickory, North Carolina.

11.   Minor child L.D.1 consumed Defendants' products from March 2023 to August 2023, when L.D.1 was approximately three years old and during her developmental stages. During this time period, L.D.1 consumed several pouches of Defendants' Products.

12.   Minor child L.D.2 consumed Defendants' products from March 2023 to August 2023, when L.D.2 was approximately one year old and during his developmental stages. During this time period, L.D.2 consumed several pouches of Defendants' Products.

13.   As a result of their respective ingestion of Defendants' Products, L.D.1 and L.D.2 have suffered catastrophic, life-long injuries including lead poisoning.

### *Defendants*

14.   Defendant WanaBana LLC is a Florida Limited Liability Corporation with its principal place of business at 9405 N. Miami Ave., Miami Shores, FL 33150.

15.   Defendant WanaBana LLC contracts for ingredients for, manufactures, tests, packages, labels, promotes, markets, advertises, and/or distributes, and sells the Products throughout the United States, including in Miami-Dade County.

16.   Defendant WanaBana LLC registered as a Florida Limited Liability Corporation on January 11, 2018.

17.   Defendant WanaBana USA LLC is a Florida Limited Liability Corporation with its principal place of business at 1413 Ponce De Leon Ave., Ste. 301 San Juan, Puerto Rico 00907.

18.   Defendant WanaBana USA LLC contracts for ingredients for, manufactures, tests, packages, labels, promotes, markets, advertises, and/or distributes, and sells the Products throughout the United States, including in the State of Florida and Miami-Dade County.

19.   The WanaBana Defendants produce, manufacture, market, distribute, and/or sell pureed fruit and vegetable products comprised of various flavorings. These products are manufactured, produced, marketed, and distributed out of Florida. At all times relevant to this Complaint, Defendant WanaBana's products were sold throughout the State of Florida and the United States.

20.  Defendant Dollar Tree Stores, Inc. is a Virginia Limited Liability Corporation with is principal place of business at 500 Volvo Parkway, Chesapeake, Virginia 23320.

21.  At all times relevant to this Complaint, Defendant Dollar Tree Stores, Inc. marketed, advertised, sold and/or the WanaBana Defendants' products to Plaintiffs and across the United States, including throughout the State of Florida and at its three Miami-Dade County locations.

22.  Defendants John Doe Corporations 1-10 are the fictitious names of corporations, partnerships, or other business entities or organizations whose identities are not presently known, and who are the alter egos of or are otherwise responsible for the conduct or liability of those who developed, manufactured, packaged, sold, supplied purchased, marketed, promoted, advertised, distributed, labeled, sold, and/or retained profits from the Products to which Plaintiffs L.D.1 and L.D.2 were exposed.

23.  Defendants as used in this Complaint collectively refers to and means Defendants WanaBana LLC, WanaBana USA LLC, Dollar Tree Stores, Inc., and the John Doe parties, either or both in its own right or as a corporate successor to an entity or person whose acts, omissions, undertakings, or activities are attributed to it by contract or operation of law.

## JURISDICTION AND VENUE

24.  This is an action for damages in excess of fifty-thousand dollars ($50,000.00).

25.  This Court has original jurisdiction pursuant to FLA. STAT. ANN. § 48.193, as Defendants committed tortious acts within the State of Florida and Miami-Dade County.

26.  Plaintiffs are entitled to bring this action before this Court as the WanaBana Defendants maintain a corporate residence in the State of Florida, Miami-Dade County.

27. This Court also has jurisdiction because the WanaBana Defendants are both Florida Limited Liability Corporations that conduct substantial business throughout the state of Florida, including Miami-Dade County.

28. The WanaBana Defendants contract with suppliers and import their Products from Ecuador for distribution throughout the United States via a large shipping and warehouse facility in Jacksonville, Florida. From this Florida location, the WanaBana Defendants then distribute the Products throughout the United States, making them available at numerous online and retail outlets including through Defendant Dollar Tree's stores.

29. The WanaBana Defendants regularly and systematically conduct business, including importing, contracting, distributing, and selling its products—including the Products at issue here—in Miami-Dade County, to consumers in Miami-Dade County, and throughout Florida and the United States.

30. During all relevant times, the WanaBana Defendants controlled the sourcing of ingredients, quality control, testing, manufacturing, design, packaging, labeling, marketing, promotion, advertising, distribution, and sales of their Products. Therefore, the WanaBana Defendants had control over the contents, packaging and labeling of their Products.

31. The WanaBana Defendants have also been involved in the manufacture, design, testing, packaging, labeling, marketing, advertising, promotion, distribution, and sales of the Products under the WanaBana name throughout the United States, including in Florida and Miami-Dade County. The WanaBana Defendants have done so continuously throughout the relevant time period.

32.   Defendant Dollar Tree regularly and systematically conducts business, including selling WanaBana Defendants' products—including the Products at issue here—in Miami-Dade County, to consumers in Miami-Dade County, and throughout Florida and the United States.

33.   The Dollar Tree Defendant has sold the Products to consumers continuously throughout the relevant time period here, including in Florida and in Miami-Dade County.

34.   Accordingly, all Defendants are subject to the jurisdiction of this Court.

35.   Venue is likewise proper in Miami-Dade County pursuant to Section 47.011, Florida Statutes because all Defendants are subject to personal jurisdiction in Miami-Dade County and regularly conduct substantial business in Miami-Dade County. Moreover, a substantial part of the events, acts and transactions giving rise to the action—including distribution, marketing, promotion, and manufacturing of the Products—occurred in Miami-Dade County, as Defendant WanaBana LLC's principal place of business is located in this District and components of the Products were shipped from Ecuador into the Miami Seaport.

## FACTUAL ALLEGATIONS

### *Plaintiffs' Facts*

36.   In or around February 2023, Plaintiffs Nicole Peterson and Thomas Duong began purchasing WanaBana Apple Cinnamon Fruit Puree pouches, from a store owned and operated by Defendant Dollar Tree, for their two Minor Children L.D.1 and L.D.2.

37.   Plaintiffs Nicole Peterson and Thomas Duong, as parents of the Minor Children, seek to provide a diet that is both nutritious and healthy for their young and developing Minor Children.

38.   As a result of these concerns, Plaintiff Nicole Peterson relied heavily on the Products' labeling which indicated it was "kosher," "additive-free," and "USDA Organic" when purchasing the Defendants' WanaBana Apple Cinnamon Fruit Puree pouches for her Minor Children.

39.   Minor Child L.D.1 began consuming Defendants' WanaBana Apple Cinnamon Fruit Puree pouches in or around February 2023, when L.D.1 was approximately two years old.

40.   Minor Child L.D.2 also began consuming Defendants' WanaBana Apple Cinnamon Fruit Puree pouches in or around February 2023, when L.D.2 was eleven months old.

41.   Minor Child L.D.1 and Minor Child L.D.2 consumed the "pouches" of Defendants' Products until approximately August 2023.

42.   In June of 2023, as part of his first annual exam, L.D.2's physician tested his blood via a fingerstick blood sample. The physician subsequently discovered that L.D.2 had an elevated level of lead in his system, with a blood lead level of 10.2 µg/dL.

43.   In June of 2023, as part of her three-year old annual exam, L.D.1's physician also collected tested her blood via a fingerstick blood sample. The physician subsequently discovered that L.D.1 had an elevated level of lead in her system, with a Blood Lead Level of approximately 12.4 µg/dL.

44.   Plaintiffs Nicole Peterson and Thomas Duong had the water at their residence tested for lead in June of 2023. The results reported less than 0.003 mg/L of lead in the water. A water lead level greater than 0.015mg/L is considered dangerous.

45.   In August of 2023, L.D.1 and L.D.2 went back to their physician for a repeat laboratory test on their blood lead levels. The blood lead level testing showed that both L.D.1 and L.D.2's blood lead levels had nearly doubled from their respective May and June testing.

46.   L.D.1's blood lead levels had elevated from 12.4 µg/dL to 24.1 µg/dL.

47.   L.D.2's blood lead levels had elevated from 10.2 µg/dL to 20.8 µg/dL.

48.   After L.D.1 and L.D.2's elevated blood lead levels nearly doubled, Plaintiffs Nicole Peterson and Duong's worry and concern for their Minor Children's health grew.

49. Plaintiffs Nicole Peterson and Thomas Duong also had their blood collected for lead testing; the results of both collections showed normal blood lead levels.

50. In response to this new development, the Catawba County Environmental Health Department conducted a lead investigation into L.D.1 and L.D.2's daycare — no sources of lead were found at the Minor Children's daycare.

51. As extensive lead investigations exhausted plausible other sources of lead to explain the cause of the Minor Children's blood lead levels to elevate nearly two-fold, the Minor Children's physician recommended that Plaintiffs Nicole Peterson and Thomas Duong conduct an "elimination diet" – a process-of-elimination audit of the food consumed in Plaintiffs' household.

52. Through doing an elimination diet during approximately August of 2023, Plaintiffs realized that the only food consumed by the Minor Children that was not consumed by Plaintiffs Nicole Peterson and Thomas Duong were the Defendants' WanaBana Fruit Puree Products.

53. Upon this discovery, the North Carolina public health authorities sent Defendants' Products from Plaintiffs' residence for lead testing at the North Carolina State Laboratory of Public Health.

54. In late August of 2023, The North Carolina State Laboratory of Public Health tested two of Defendants' fruit puree "pouch" products: the Apple Cinnamon Puree and the Apple Banana Puree.

55. After conducting its testing, The Inorganic Chemistry Team at the North Carolina State Laboratory of Public Health reported that the sampled WanaBana Apple Cinnamon Puree had a lead level of 1.9 mg/kg. The acceptable limit for lead levels is 0.1 mg/kg or less.

56. As to the WanaBana Apple Banana Puree that contained no cinnamon, the North Carolina State Laboratory of Public Health reported that it only contained less than 0.05mg/kg of lead.

57.   Immediately following the elimination diet, and while the Defendants' Products were being tested by the North Carolina State Laboratory of Public Health, the Minor Children stopped consuming Defendants' Products.

58.   Accordingly, another blood lead test was conducted on L.D.1 and L.D.2. These subsequent tests revealed that the Minor Children's blood lead levels had declined.

59.   Since eliminating Defendants' Products from her diet, L.D.1's blood lead level declined from 24.1 µg/dL to 12.9 µg/dL.

60.   Since eliminating Defendants' Products from his diet, L.D.2's blood lead level declined from 20.8 µg/dL to 13.5 µg/dL.

61.   Following the Minor Children's exposure, Plaintiffs Nicole Peterson and Thomas Duong began treatments for their Minor Children for lead extraction, and developmental and medical monitoring.

62.   Continued treatment is necessary for childhood lead poisoning victims, such as L.D.1 and L.D.2, because lead poisoning can manifest itself throughout an individual's life through developmental delays, learning difficulties, irritability, loss of appetite, sluggishness and fatigue, abdominal pain, vomiting, constipation, hearing loss, and seizures. As a result, regular monitoring is required for early detection of lead poisoning manifestations.

63.   As a result of consuming Defendants' Products, L.D.1 and L.D.2 are subject to continued treatment and monitoring, requiring routine appointments with physicians, chelation treatment, blood lead level testing, developmental testing, and regular appointments with a nutritionist.

64.   Recent physician testing for L.D.1 reports that her elevated blood lead levels have dropped into the single digits since L.D.1 stopped consuming Defendants' Products in the Summer of 2023.

65.   Recent physician testing for L.D.2 reports that her elevated blood lead levels have dropped into the single digits since L.D.2 stopped consuming Defendants' Products in the Summer of 2023.

### *North Carolina Public Health Authorities' Investigation of Plaintiffs' Lead Exposure Leads to FDA Action and Recall*

66.   Upon the North Carolina public health authorities' discovery of lead contained in Defendants' Products purchased and consumed by Plaintiffs, as well as the Products simultaneously being linked two other childhood lead poisoning cases in North Carolina, North Carolina public health authorities issued a statement ("NCDHHS Statement") regarding four children—including L.D.1 and L.D.2— in the State who were found to have high levels of lead in their blood linked to the WanaBana Defendants' puree products.[1]

67.   On or about October 30, 2023, the FDA issued a public health alert, based on the NCDHHS Statement and coordinated investigations among North Carolina public health authorities, that the Products contained "extremely high levels" of the lead (hereinafter referred to as "FDA Alert"). [2]

68.   The FDA Alert stated that the NCDHHS "analyzed multiple lots of WanaBana apple cinnamon fruit puree, detecting extremely high concentrations of lead."[3]

---

[1] North Carolina Department of Health and Human Services ("NCDHHS"), *NCDHHS Urges Caution After Reportable Lead Found in WanaBana Brand Apple Cinnamon Puree*, https://www.ncdhhs.gov/news/press-releases/2023/10/28/ncdhhs-urges-caution-after-reportable-lead-found-WanaBana-brand-apple-cinnamon-puree, Oct. 28, 2023 (last accessed Jan. 18, 2023) ("NCDHHS Statement").

[2] Food and Drug Administration ("FDA"), *FDA Advises Parents and Caregivers Not to Buy or Feed WanaBana Apple Cinnamon Fruit Puree Pouches to Toddlers and Young Children Because of Elevated Lead Levels*, https://www.fda.gov/food/alerts-advisories-safety-information/fda-advises-parents-and-caregivers-not-buy-or-feed-WanaBana-apple-cinnamon-fruit-puree-pouches, Nov. 3, 2023 (last accessed Jan. 18, 2023) ("FDA Alert").

[3] *Id.*

69.  The FDA Alert also stated that "The FDA has reviewed and supports NCDHHS's analytical findings and found that analytical results at this level could result in acute toxicity" and that it "has shared the results with [WanaBana Defendants] whose representatives are cooperating with the FDA and have agreed to voluntarily recall all WanaBana apple cinnamon fruit puree pouches regardless of expiration." [4]

70.  The FDA identified and confirmed the serious health implications arising from lead exposure and its toxicity.[5]

71.  On November 3, 2023, the investigation into WanaBana Defendants' Products was transferred to the FDA's Coordinated Outbreak Response & Evaluation (CORE) Network for continued investigation "in collaboration with the Centers for Disease Control and Prevention (CDC) and state and local partners."[6]

72.  On November 09, 2023, the FDA announced that the recall of WanaBana Apple Cinnamon Fruit Puree pouches was expanded to include Schnucks Apple Sauce 90g pouches with cinnamon, and Weis Cinnamon Apple Sauce 90g, both of which are independently distributed private label brands of the WanaBana Defendants.[7]

73.  The FDA also made a statement that "FDA is aware that, as of December 13 [2023], recalled WanaBana Apple Cinnamon Puree product (including recalled three packs) was still on the shelves at several Dollar Tree stores in multiple states. As of December 19 [2023], FDA also

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] FDA, *Company Announcement: WanaBana Recalls WanaBana, Weis, and Schnucks Apple Cinnamon Fruit Purée Pouches & Cinnamon Apple Sauce Due to Elevated Lead* Levels, Nov. 9, 2023, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/WanaBana-recalls-WanaBana-weis-and-schnucks-apple-cinnamon-fruit-puree-pouches-cinnamon-apple-sauce (last accessed Jan. 18, 2024)

received a report that recalled WanaBana Apple Cinnamon Puree product (including recalled three packs) may still be on shelves at Family Dollar/Dollar Tree combination stores. This product should not be available for sale and consumers should not purchase this product."[8]

74.   FDA officials investigating Defendants' Products have raised the possibility that the lead contamination in the cinnamon used by Defendants may have been intentionally added for economic reasons.[9]

75.   The FDA's Department of Health and Human Services conducted an inspection of the facility where the Products were processed, the facility which mixes the ingredients which are put into the final products, including the Products at issue here. The inspection was conducted from December 4th to December 14th 2023.[10]

76.   The FDA inspection report found that the WanaBana Defendants did not include cinnamon in its hazard analysis which required a preventative control for heavy metals, including lead.[11]

77.   The FDA inspection report further reported that the WanaBana Defendants did not sample and test raw materials or the finished products for heavy metals, including lead.[12]

---

[8] FDA, *Investigation of Elevated Lead & Chromium Levels: Cinnamon Applesauce Pouches (November 2023)*, https://www.fda.gov/food/outbreaks-foodborne-illness/investigation-elevated-lead-chromium-levels-cinnamon-applesauce-pouches-november-2023 (last accessed Jan. 18, 2024).

[9] Associated Press, *Parents of Children Sickened by Lead Linked to Tainted Food Pouches Fear for Kids' Future*, https://apnews.com/article/WanaBana-apple-cinnamon-lead-poisoning-fruit-pouch-86c32266e010843d0c9ad3340ccae319 (last accessed Jan. 22, 2024).

[10] FDA Health and Human Services, *Austrofood S.A.S. Inspection*, FEI No. 3013416401, Dec. 14, 2023, 2024-01-24_fda_foia-2023-11285-ocr.pdf (tinalexander.github.io) (last accessed Jan. 24, 2024).

[11] *Id.*

[12] *Id.*

78.   Additionally, the FDA inspection report concluded that the WanaBana Defendants did not have an appropriate preventative control and monitoring procedure in place to significantly minimize or prevent hazards. In particular, the report cited the food safety plan for apple cinnamon puree to be not sufficient for prevent hazards.[13]

79.   The FDA Inspection report identified that the WanaBana Defendants' Products processing facility had no controls in place to account for metal contamination from the rough edges, chips, and pitted areas that are present on the conveyer belt which processes the puree in the Products.[14]

80.   This food safety misconduct and the failed preventative controls, as identified in the FDA inspection report, resulted in the lead poisoning of dozens of children and consumers, including Plaintiffs L.D.1 and L.D.2.

81.   As of January 3, 2024, the FDA has received 89 total complaints/Adverse Event Reports.[15]

82.   The median age of the individuals affected by lead poisoning caused by Defendants' Products is one year old.[16]

83.   The CDC's investigation identifies links between blood lead levels of 3.5 µg/dL or higher in children within three months of the consumption of Defendants' Products. The CDC reports that, as of January 19, 2024, it has received reports from state and local health departments that

---

[13] *Id.*

[14] *Id.*

[15] FDA, *Investigation of Elevated Lead & Chromium Levels: Cinnamon Applesauce Pouches (November 2023)*, https://www.fda.gov/food/outbreaks-foodborne-illness/investigation-elevated-lead-chromium-levels-cinnamon-applesauce-pouches-november-2023 (last accessed Jan. 23, 2024).

[16] *Id.*

implicate over 385 total cases of lead poisoning resulting from exposure to WanaBana Defendants' Products.[17]

84.  Additional laboratory testing by the FDA of Defendants' Products found that the Products also contained chromium.[18]

85.  On January 5, 2024, the FDA announced that WanaBana's cinnamon and recalled products also contained elevated levels of chromium contamination as high as 1201ppm in the cinnamon. At high levels chromium can cause toxicity and the more toxic form of chromium is "chromium (VI)." The quantity of chromium detected by the FDA and the leadto-chromium ratio is consistent with lead chromate ($PbCrO_4$).[19]

86.   Lead chromate typically appears as a yellow, orange, and red power and is often used as a pigment in a powder or paint. It is carcinogenic, a neurotoxin, and a nephrotoxin.

87.  Lead chromate primarily affects the lungs, but it can also affect the gastrointestinal tract, liver, kidneys, and immune system. Lead chromate also contains the most toxic form of chromium (chromium VI).

### *The Longstanding Knowledge of the Dangers of Lead*

88.  Defendants' Products contained lead and chromium.

89.  Lead is toxic heavy metal, upon which exposure and ingestion can lead to lead poisoning.

90.  Lead poisoning can result in serious, life-long adverse health effects especially in children.

---

[17] Center for Disease Control and Prevention, *Lead and Chromium Poisoning Outbreak Linked to Cinnamon Applesauce Pouches*, Dec. 20, 2023, https://www.cdc.gov/nceh/lead/news/lead-poisoning-outbreak-linked-to-cinnamon-applesauce-pouches.html (last accessed Jan. 23, 2024)
[18] *Id.*
[19] *Id.*

91.   The harmful effects of lead poisoning in children can include, but are not limited to: behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and anemia.[20]

92.   The harm that lead poisoning inflicts on children has been well-known for decades.

93.   Lead is dangerous to children, in particular, "because their growing bodies absorb more lead than adults do and their brains and nervous systems are more sensitive to the damaging effects of lead."[21]

94.   Indeed, children absorb ingested lead from a given source 4-5 times more than adults. [22]

95.   "The neurological and behavioural effects of lead are believed to be irreversible."[23]

96.   Moreover, there is no known safe blood level concentration in children.[24]

97.   The World Health Organization reports that even "blood lead concentrations as low as 3.5 µg/dL may be associated with decreased intelligence in children, behavioral difficulties and learning problems.[25]

98.   The World Health Organization has also identified lead as one of its 10 chemicals that constitute a major public health concern.[26]

---

[20] EPA, Learn About Lead https://www.epa.gov/lead/learn-about-lead#effects (last accessed Jan. 14, 2024).
[21] *Id.*
[22] World Health Organization, Lead Poisoning https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health#:~:text=Exposure%20to%20lead%20can%20affect,%2C%20liver%2C%20kidney%20and%20bones. (last accessed Jan. 14, 2024).
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

99.   Lead in the body is known to distribute throughout a child's brain, liver, kidney, and bones. It is also stored in a child's teeth and bones, where it can accumulate over time.[27]

100.   The FDA and the World Health Organization have declared lead to be dangerous to human health. [28]

101.   In addition to the lead, the chromium in defendants' contaminated products represents a significant health risk. Although chromium is naturally occurring and may be normally found within a diet, at high levels it is toxic. Moreover, there is a significant difference between trivalent chromium (chromium (III)) and the significantly more toxic hexavalent chromium (chromium (VI)). Chromium (VI) is a known carcinogen and has been associated with other health effects when ingested including irritation, ulcers, and anemia. Although the health effects of eating food contaminated with chromium (VI) are not well understood, there is also no antidote to treat chromium exposure.[29]

102.   The more toxic and dangerous form of chromium (chromium (IV)) is found in lead chromate. Lead chromate has been used to adulterate spices, such as turmeric, and is toxic. The FDA's reported laboratory ratios of lead and chromium found in Defendants' Products are consistent with the Products being contaminated with lead chromate.

---

[27] *Id.*

[28] *See, e.g.*, U.S. House of Representatives Committee on Oversight and Reform, *Staff Report: Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* at 2, Feb. 4, 2021, https://oversightdemocrats.house.gov/sites/democrats.oversight.house.gov/files/2021-02-04%20ECP%20Baby%20Food%20Staff%20Report.pdf (last accessed Jan. 18, 2024).

[29] CDC, *Lead and Chromium Poisoning Outbreak Linked to Cinnamon Applesauce Pouches*, https://www.cdc.gov/nceh/lead/news/lead-poisoning-outbreak-linked-to-cinnamon-applesauce-pouches.html (last accessed Jan. 24, 2024).

103. Adulteration of spices using lead chromate compounds has been documented globally as a growing public health concern. It has contributed to lead poisoning of children and adults around the world.[30]

104. Lead chromate is considered a hazardous substance in the United States for several reasons, including its carcinogenic nature, its risk of causing lead poisoning, and its risk of causing kidney and brain damage, among other major health concerns.[31]

105. Given the negative effects of lead on child development and adult health, the presence of these substances in food is material to reasonable consumers, including Plaintiffs, as it relates to their purchasing and consumption decisions.

106. Defendants' Products included undisclosed levels of lead, due to Defendants' failure to sufficiently monitor for their presence in the ingredients and finished products. Defendants were or should have been aware of this risk.

107. Concerns over exposure to lead, and the knowledge of such risks associated with exposure, are not a new phenomenon, and Defendants knew or should have known of the risks associated with the presence of lead in foods they sell to consumers.

108. Defendants knew or should have known that it owed consumers, including Plaintiffs, a duty of care to prevent, or at the very least, minimize the presence of lead in the Products to the extent reasonably possible.

109. Defendants knew or should have known that it owed consumers, including Plaintiffs, a duty of care to adequately test for lead in the Products and the contributing ingredients.

---

[30] Lopez, Alandra et al., *Assessing Analytical Methods for the Rapid Detection of Lead in the Global Spice Market*, Environ. Sci. Technol. 2022, 56, 23, 16996–17006, Nov. 7 2022, https://pubs.acs.org/doi/epdf/10.1021/acs.est.2c03241 (last accessed Jan. 24, 2024).
[31] National Center for Biotechnology Information (2024), *Lead Chromate Compound Summary*, https://pubchem.ncbi.nlm.nih.gov/compound/Lead-chromate (last accessed Jan. 24, 2024).

110.  Defendants also had a duty to ensure the Products were not deceptively, misleadingly, unfairly, and falsely marketed and that all material information was properly and fully disclosed.

111.  Defendants knew or should have known that proper and sufficient testing and/or monitoring the Products for lead in both the ingredients and finished products was critical.

112.  Defendants knew, yet failed to disclose, that they were not sufficiently or adequately monitoring or testing the Products or ingredients used in the Products for lead.

113.  Defendants knew or should have known they could control the levels of lead in the Products by properly monitoring and testing for lead at ingredient sourcing, manufacturing, and packaging stages, and effecting changes when needed.

114.  In addition, Defendants knew or should have known that a reasonable consumer would consume the Products regularly, leading to repeated exposure to and accumulation of lead.

### *Defendants Made Material Misrepresentations and Omissions*

115.  Upon information and belief, the WanaBana Defendants' exclusive packager is Ecuadorian-based company Austrofoods, which ships the WanaBana Products to the United States.[32]

116.  Upon information and belief, the WanaBana Defendants' exclusive cinnamon supplier is the Ecuadorian-based company Negasmart, which provided the contaminated cinnamon which was added to the Products.[33]

---

[32] FDA, *Investigation of Elevated Lead & Chromium Levels: Cinnamon Applesauce Pouches (November 2023)*, https://www.fda.gov/food/outbreaks-foodborne-illness/investigation-elevated-lead-chromium-levels-cinnamon-applesauce-pouches-november-2023 (last accessed Jan. 24, 2024).
[33] *Id.*

117.  Ecuadorian authorities have reported that Negasmart's cinnamon, which was added to the Products here, had higher levels of lead than allowed by Ecuador.[34]

118.  Upon information and belief, WanaBana Defendants' agents vetted Negasmart and its cinnamon. These vetting procedures were either inadequate or the WanaBana Defendants deliberately disregarded in that the procedures failed to identify the presence of harmful lead and chromium in the Products.

119.  Upon information and belief, neither the WanaBana Defendants nor its supplier agents tested the cinnamon before incorporating it into the Products.

120.  Upon information and belief, the WanaBana Defendants selected and used ingredients from an exclusive supplier that they knew or should have known was intentionally adding lead to its cinnamon spice product to increase the weight, and therefore the value, of the cinnamon.[35]

121.  The WanaBana Defendants have a duty to ensure that their products, including the Products at issue here, were not contaminated with lead or other harmful substances. This duty derives, in part, from the WanaBana Defendants' control and oversight of its agents, including its exclusive suppliers, that contribute to the manufacture of the end Products to which Plaintiffs L.D.1 and L.D.2 were exposed.

122.  The WanaBana Defendants' duty to ensure their products, including the Products at issue here, are safe and free of harmful substances, such as lead, is of even greater significance because of the WanaBana Defendants' knowledge that their products will be consumed by children and their marketing efforts consistent with that knowledge.

---

[34] *Id.*
[35] *Id.*

123.   Meanwhile, WanaBana Defendants make specific representations to consumers that their fruit pouches, including the Products at issue in this litigation, are high- quality, healthy, and safe products for consumers, including Plaintiffs, to choose for their children, including that they are the "ideal snack for the whole family."[36]

124.   The product's selected slogan, "I AM ONLY FRUIT," is used by WanaBana Defendants to imply to parents that they are purchasing for their children a premium, healthy fruit puree pouch.[37]

125.   Defendants used the same slogan "I AM FRUIT" on the "apple cinnamon" flavor Products ingested by L.D.1 and L.D.2. The front packaging of the Products also reads: "No preservatives," "Gluten free," "NO SUGAR ADDED," and "KOSHER."[38]

126.   The back of the apple cinnamon Products ingested by L.D.1 and L.D.2 lists three ingredients: "apple puree, cinnamon powder, acidulant: citric acid."[39]

127.   The back of the apple cinnamon Products ingested by L.D.1 and L.D.2 also states that the Products are "Gluten Free" and contain no BPA in its packaging.[40]

128.   Defendant Dollar Tree sells three-packs of the WanaBana Defendants' products in brick-and-mortar retail locations as well as through its website.[41]

---

[36] WanaBana, *Homepage*, https://WanaBana.com/ (last accessed Jan. 15, 2024)

[37] WanaBana, *Fruit Pouch*, https://WanaBana.com/fruit-pouch/ (last accessed Jan. 15, 2024).

[38] See USA Today, *All WanaBana apple cinnamon pouches recalled for potentially elevated levels of lead: FDA*, image provided by FDA therein, https://www.usatoday.com/story/money/2023/10/30/WanaBana-fruit-pouch-recall-lead/71378400007/ (last accessed Jan. 15, 2024).

[39] *See id.*

[40] *See id.*

[41] See, e.g., Dollar Tree, *WanaBana Fruit Puree Pineapple Banana Fruit Pouches, 3-ct. 7.5 oz.*, https://www.dollartree.com/WanaBana-fruit-puree-pineapple-banana-fruit-pouches-3-ct-75-oz/370158 (last accessed Jan. 15, 2024).

129.  The boxing encasing the "3-pack" of fruit puree pouches also states that the products are Kosher, contain no preservatives, are gluten free, "[r]eady to eat," and are in "BPA Free Packaging."

130.  The WanaBana Defendants also tout the purported safety and quality of their products on their website. As an example, the WanaBana Defendants list six certification seals followed by the statement: "We have certifications that guarantee the excellence of our food processes. Ensuring a product with worldwide safety and quality."[42]

131.  The WanaBana Defendants also displayed logos of other certifications, but the WanaBana Defendants have since removed those logos since the FDA's Alert.

132.  The WanaBana Defendants' "Our Story" website page features language which tours their purported commitment to their consumers by "exceeding the expectations of our customers through the elaboration of products derived from fresh fruits that meet quality, safety, legality and authenticity parameters focused on continuous improvement in our BPM management systems, HACCP, BRC, SGCS BASC and nationally and internationally recognized quality standards."[43]

133.  In order to achieve this purported commitment, the WanaBana Defendants state: "we have a team of highly qualified people, controlled processes and a food safety management system, which allows us to guarantee the safety of our products and a continuous improvement of our processes, as well as the prevention of illegal activities, corruption and bribe."[44]

---

[42] WanaBana, *Homepage*, https://WanaBana.com/ (last accessed Jan. 15, 2024). From left: certified Kosher; the Business Alliance for Secure Commerce, certified compliant; Good Manufacturing Practice certified; and certified organic by the European Union; certified organic by the U.S. Department of Agriculture; and certified organic by Quality Certification Services – Ecuador.
[43] WanaBana, Our Story, WanaBana.com/about-us (last accessed Jan. 15, 2024).
[44] *Id.*

134.  The WanaBana Defendants make repeated statements on their website that their products are safe and high-quality, using their certifications as an endorsement of their purported quality: "[o]ur products not only maintain the fruit's organoleptic and nutritional characteristics, but also carry a production line with the highest standards in the market, evidenced in the certifications obtained year after year."[45]

135.  The WanaBana Defendants have yet to make a post on its official English Facebook or Instagram pages warning consumers about the recall of its Products.

136.  In fact, the WanaBana Defendants' Instagram postdated October 17, 2023 shows an image of its apple cinnamon pouch Products with a "Your Brand Here" affixed on the rendering of the pouch. The purpose of the post was to announce the WanaBana Defendants' attendance at the Private Label Manufacturers Association, further stating: "It's a #Wanafantastic opportunity to find out more about our innovative packaging, products, and all that we can do with #realfruit and #newblends."[46]

137.  The WanaBana Defendants' Instagram Page states the following about its products in its bio/page description:[47]

    a.   "Purees, pulps & smoothies 100% Fruit 🥭 🍎 🍐;"

    b.   "No sugar added;"

    c.   "Practical package, easy to carry and enjoy;"

    d.   "Quality certification;"

---

[45] *Id.*
[46] WanaBana USA & Canada Instagram Page, *Oct. 17th 2023 Instagram Post*, Instagram.com/WanaBanausa (last accessed Jan. 15, 2024).
[47] WanaBana USA & Canada Instagram Page, Instagram.com/WanaBanausa (last accessed Jan. 15, 2024).

138.  The WanaBana Defendants' Instagram Page also contains posts which explicitly markets its products to children, including with one post featuring a child painting beside an interposed graphic of a WanaBana fruit puree pouch, with the caption stating: "Encourage your children's 🧠😊 imagination🎨 with a snack that will give them the vitamins and minerals they need for their growth. WanaBana is real fruit!😊 Give WanaBana a try in its many delicious flavors."[48]

139.  Another post on WanaBana Defendants' Instagram page purports that its products give energy and nutrition to children: "The energy and nutrition that WanaBana gives children is incredible. Have you tried the WanaBana puree and pulp yet? The little ones in your home will love it."[49]

140.  The WanaBana Defendants also reassert their claims about the purported safety and health benefits of their products on their Facebook page bio:[50]

   a.  "A convenient and versatile way to enjoy real fruit. Made out of 100% natural fruit. No added sugar, no preservatives, no additives. BPA free package[.] Quality recognized internationally. We help develop agriculture & agroindustry with innovative solutions."

141.  When advertising their products on Facebook, the WanaBana Defendants regularly use the hashtags such as "#onlyfruit," "#realfruit," "#organicfruit" to market their puree products. [51]

---

[48] WanaBana USA & Canada Instagram Page, *Jan. 28, 2022 Instagram Post*, https://www.instagram.com/p/CZSiugRroxk/ (last accessed Jan. 15, 2024).

[49] WanaBana USA & Canada Instagram Page, *Jan. 22, 2022 Instagram Post*, https://www.instagram.com/p/CZDF9a-trCj/ (last accessed Jan. 15, 2024).

[50] WanaBana USA Facebook Page, https://www.facebook.com/WanaBanausa/ (last accessed Jan. 15, 2024).

[51] *See id.* at *Feb. 18, 2022 Post*.

142. The WanaBana Defendants also state on their Facebook page, under the privacy and legal info tab:[52]

    a. "JUST OPEN AND ENJOY – Convenient and versatile way to enjoy a real fruit wherever you go and does not need to be refrigerated."

    b. "I AM ONLY FRUIT – Made of only 100 percent natural fruit. We are dedicated to the production, and processing of fresh fruit to guarantee a healthy option for the whole family."

    c. "NATURAL - No added sugar, no preservatives, no additives, and comes in a BPA-free package giving you and your loved ones a high-quality addition to your diet."

    d. "EXTRAORDINARY STANDARDS – Recognized both at the national and international level, while also striving for innovation and contributing to the development of agriculture and agroindustry. "

143. These statements are demonstrably false, as Plaintiffs Minor Children L.D.1 and L.D.2 and other consumers have suffered from lead poisoning due to ingesting Defendants' Products.

144. Contrary to Defendants' representations and assurances that its Products are safe, healthy, certified, and manufactured under strict quality standards, Defendants' Products contain detectable levels of lead, which is known to pose life-long human health risks—particularly in children.

145. Defendants failed to disclose to consumers that the Products contain or have a material risk of containing lead.

---

[52] WanaBana USA Facebook Page, *About*, https://www.facebook.com/WanaBanausa/about (last accessed Jan. 15, 2024).

146. Consumers, including Plaintiffs, trusted manufacturers like the WanaBana Defendants and retailers like Defendant Dollar Tree to sell only fruit puree products that are safe for themselves and their children, not to sell products that contain or have a material risk of containing lead.

147. Reasonable consumers, including the Plaintiffs, expect the fruit puree products they purchase for their children will not be contaminated or have a material risk of being contaminated with lead — a substance that is known to accumulate in the body and pose significant and dangerous health consequences.

148. The quality of a product's contents, particularly as it relates to toxic contents such as lead, are material to a reasonable consumer's purchasing and consumption decision, including Plaintiffs' decisions.

149. Consumers, including Plaintiffs, lack the scientific knowledge or ability to conduct their own testing to determine whether Defendants' products do in fact contain lead, or to ascertain the true nature of the ingredients and quality of Products. Accordingly, reasonable consumers must and do rely on each Defendant to: (1) know what their Products contain; (2) regularly rest the Products to confirm their quality and compositions; and (3) properly and fully disclose these contents to consumers prior to sale and consumption.

150. Defendants knew or should have known that their Products contained lead and wrongfully failed to disclose that the Products contain or have a material risk of containing lead on its packaging.

151. Defendants knew or should have known that their Products contained lead yet chose to not disclose such information to consumers and thus actively concealed the presence and risk of lead in the Products.

152.  No reasonable consumer would expect, suspect, or understand that the Products contain or have a material risk of containing lead.

153.  Defendants failed to disclose on the Products' packaging that the Products contain or have a material risk of containing lead. It was only through the FDA and NCDHHS' testing, including testing conducted on Plaintiffs' pouches, and subsequent advisories that the general public became aware of the lead content in Defendants' Products.

154.  Based on Defendants' misrepresentations and omissions, no reasonable consumer, including Plaintiffs, had any reason to know, suspect, or expect that the Products contained lead.

155.  Defendants are aware that their customers trust the quality of their Products and would not expect the Products to contain or have a material risk of containing lead.

156.  As evidenced by Defendants' marketing, Defendants also know that reasonable consumers, especially parents, seek out products with ingredients free of toxins or contaminants, and that these consumers will pay more for products they believe meet these standards.

157.  Defendants also know that reasonable consumers would not knowingly consumer, or feed to their families and children, products that contain lead.

158.  Defendants knew that the consumers to whom it markets the Products would find their misrepresentations and omissions to be material and that Defendants were in a special position of public trust to those consumers.

159.  In light of Defendants' representations regarding the health and quality standards of Defendants' operations and Products, Defendants knew or should have known the Products contained or had a material risk of containing lead.

160.  Defendants' misrepresentations and omissions are deceptive, misleading, unfair, and/or false because the Products contain undisclosed lead.

26

161.  Defendants' misrepresentations and omissions allowed Defendants to capitalize on, and reap enormous profits from, reasonable consumers like Plaintiffs that omitted material information as to the Products' true quality and value and, in fact, poisoned their children.

162.  The popularity of pureed products in "pouch" form, including the Products at issue in this litigation, is increasing across the world, as parent-consumers, including Plaintiffs, seek nutritious and convenient foods for their children.

163.  The purported safety and health benefits of Defendants' Products are fully displayed on Defendants' packaging, as set forth in this Complaint.

164.  Defendants' misrepresentations and omissions wrongfully convey to consumers that Defendants' Products are of superior quality and have certain characteristics that the Products do not actually possess.

165.  Defendants' misrepresentations and omissions have caused consumers, including the Plaintiffs here, to believe the Products do not contain any harmful substances, when in fact the Products contain or have a material risk of containing undisclosed levels of lead, which is material information to reasonable consumers, including Plaintiffs.

166.  Defendants' misrepresentations and omissions make the Products' packaging deceptive based on the presence or risk of lead in the Products. Reasonable consumers, including Plaintiffs, would consider the presence or risk of lead in the Products to be a material fact when considering which applesauce or other pureed products to consume.

167.  Defendants' misrepresentations were material and misleading due to Defendants' failure to sufficiently or adequately monitor, control, or test for and disclose the presence or material risk of lead in the Products.

168. Information regarding the true nature and/or presence of lead in the Products was and is in the exclusive possession of Defendants and not available to consumers. Defendants chose to not disclose such information to consumers and thus concealed the presence and risk of lead in the Products from Plaintiffs.

169. Although Defendants are in the best position to know what content it placed on their website(s), social media sites, and in marketing materials during the relevant timeframe; the knowledge Defendants had regarding presence of lead in their Products; and their failure to disclose the existence of lead in the Products to Plaintiffs and consumers both before and after the Products were recalled; Plaintiffs allege the following facts with particularity:

a. WHO: Defendants made false statements and material misrepresentations and/or omissions of fact on their Products, labeling, marketing materials and in public statements, which include express and/or implicit representation that their Products were and are free of lead and were safe for human consumption.

b. WHAT: Defendants falsely and misleadingly, and through misrepresentations and omissions, led consumers to believe that their Products were and are free of lead and failed to disclose that the Products contain these materials. Thus, Defendants' conduct deceived Plaintiffs into believing that the Products were created, manufactured, and sold with such qualities. Defendants knew or should have known this information is material to reasonable consumers, including Plaintiffs, in making their decisions about the food to feed to their children, yet Defendants continued to pervasively market the Products as possessing qualities they do not possess.

c.   WHEN: Defendants made material misrepresentations, false statements and/or omissions both prior to and at the time Plaintiffs L.D.1 and L.D.2 consumed Defendants' Products.

d.   WHERE: Defendants' marketing message was uniform and pervasive, carried through material misrepresentations, false statements and/or omissions on their Products labeling and packaging, websites, and social media accounts.

e.   HOW: Defendants made material misrepresentations, false statements and/or omissions regarding the presence of lead in their Products by making express and/or implicit representations in the above-referenced materials that their Products were healthy, safe, and made of premium ingredients and by omitting any facts in their marketing, labeling, and/or other descriptions of their Products that would inform a consumer as to the presence of lead.

## **CAUSES OF ACTION**

### **COUNT ONE – All Defendants – Strict Liability Failure to Warn**

170.   All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

171.   At all pertinent times, the WanaBana Defendants were engaged in manufacturing, marketing, testing, promoting, selling and/or distributing Products in the regular course of business.

172.   At all pertinent times, the WanaBana Defendants knew or should have known that the use of their Products which contained lead significantly increases the risk of causing catastrophic, life-altering lead poisoning in children.

29

173. At all pertinent times, Defendant Dollar Tree was engaged in the business of marketing, promoting and selling the Products in the regular course of business.

174. At all pertinent times, Defendant Dollar Tree knew or should have known that the use of their Products which contained lead significantly increases the risk of causing catastrophic, life-altering lead poisoning in children.

175. At all pertinent times, Plaintiffs ingested Defendants' Products, which is a reasonably foreseeable use and in a manner normally intended by the Defendants.

176. At all pertinent times, Defendants' Products were unreasonably dangerous and in a defective condition because, among other things, it failed to warn Plaintiffs of the presence of lead in the Products and the increased risk of lead poisoning and catastrophic injury as a result of their ingestion. Had Plaintiffs received a warning that the Defendants' Products contained lead and that ingestion would result in lead poisoning, then Plaintiffs Nicole Peterson and Thomas Duong would not have used Defendants' Products in that manner, if at all.

177. These defects in Defendants' Products substantially contributed to Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

178. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore**, Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

### COUNT TWO – WanaBana Defendants - Strict Liability – Defective Design

179. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

180. The WanaBana Defendants were in the business of designing, manufacturing, packaging, labeling, selling, and distributing the Products in the regular course of business.

181. The WanaBana Defendants had a duty of a reasonable manufacturer to foresee and appreciate risks of harm associated with the ordinary use of their Products.

182. At all pertinent times, the WanaBana Defendants knew or in the exercise of reasonable care should have known that children ingest their fruit puree Products.

183. At all pertinent times, the WanaBana Defendants knew or in the exercise of reasonable care should have known that the use of their Products which contained lead significantly increases the risk of causing catastrophic, life-altering lead poisoning in children.

184. The Products are defective in design because the foreseeable risk of becoming poisoned by lead exceeds a reasonable consumer's expectations that when consumed by children the fruit puree Products are safe, that the risk of being exposed to lead as a result of ingestion significantly outweighs any potential benefit, and that the Products contain lead.

185. At all pertinent times, the Products were substantially in the same condition as when it left the possession of the WanaBana Defendants.

186. At all pertinent times, Plaintiffs L.D.1 and L.D.2 used the Products for food, which was a reasonably foreseeable and normally intended use by the WanaBana Defendants, as they gave no warnings in opposition, but rather promoted use of the Products for consumption by children and adults alike.

187. The Products' defective design was a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

188. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore**, Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

### COUNT THREE – WanaBana Defendants– Gross Negligence

189. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

190. At all pertinent times, the WanaBana Defendants had a duty to reasonably and properly design, manufacture, test, inspect, package, label, distribute, market, examine, maintain, supply,

provide proper warnings and prepare for use the Products, as a reasonably prudent and careful manufacturer. The WanaBana Defendants owed this duty to Plaintiffs.

191. The Products which contained lead posed a clear and present danger to all foreseeable consumers, including children and Plaintiffs.

192. At all pertinent times, the WanaBana Defendants' cinnamon supplier, upon information and belief, intentionally added lead to the cinnamon to increase the cinnamon's weight-per-unit economic value. This cinnamon was then added to the Products as part of the WanaBana Defendants' manufacturing process.

193. At all pertinent times, the WanaBana Defendants knew or in the exercise of reasonable care should have known that the Products were not properly designed, manufactured, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared and/or provided with the proper warnings, and was unreasonably likely to injure users and consumers, including Plaintiffs L.D.1 and L.D.2. The WanaBana Defendants' conduct created a foreseeable risk of injury to Plaintiffs and all of its customers.

194. The WanaBana Defendants breached their duty by, among other things:

    a.    Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, advertisement, marketing, promotion, distribution, and/or sale of the Products;

    b.    Allowing its exclusive supplier to contaminate the cinnamon in its Products with lead;

    c.    Failing to warn Plaintiffs of the hazards associated with the use of the Products, including the risk of ingesting lead and being lead poisoned after consuming the Products;

   d.   Failing to properly test the Products to determine the adequacy and effectiveness or safety measures, if any, prior to release for consumer use;

   e.   Failing to warn Plaintiffs that the Products contained lead;

   f.   Choosing a supplier that intentionally added lead to the product to increase the weight, and consequently, the value of the cinnamon;

   g.   Failing to properly test and/or conduct a quality control of the Products to determine the increased risk of children being lead poisoned from normal and/or intended use;

   h.   Failing to adequately test the Products to ensure the absence of lead contamination;

   i.   Failing to inform ultimate users, such as Plaintiffs as to the safe and proper consumption of the Products;

   j.   Failing to remove Products from the market or adding proper warnings when the WanaBana Defendants knew or in the exercise of reasonable care should have known the Products were defective;

   k.   Failing to instruct the ultimate user, such as Plaintiffs, as to the methods of reducing the type of exposure to Products which led to an increased risk of lead poisoning; and

   l.   Marketing and labeling the Products as safe for all uses despite knowledge to the contrary and/or lack of testing to support their marketing and labeling claims.

195. The WanaBana Defendants were grossly negligent as defined by Florida Statutes Chapter 768, Section 72, in that they acted reckless and in conscious disregard or indifference to the life, safety, or rights of persons exposed to their Products.

196. The WanaBana Defendants also conducted intentional misconduct as defined by Florida Statutes Chapter 768, Section 72 through their actions of adding lead-contaminated cinnamon to

its Products. These actions are imputed to the WanaBana Defendants through their exclusive Ecuadorian-based suppliers.

197.   The WanaBana Defendants' foregoing conduct was grossly negligent and in breach of their duty to Plaintiffs, and a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

198.   As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore**, Plaintiffs request a judgment against Defendants jointly and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate, and demands trial by jury of all issues raised herein.

## COUNT FOUR – Defendant Dollar Tree – Gross Negligence

199.   All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

200.   Defendant Dollar Tree is engaged in the business of selling low-cost food products. Their business model is designed to maximize its profits as a retailer, and the Products are one such example of Defendant Dollar Tree's low-quality food products sold for a large financial return.

201.  In so doing, Defendant Dollar Tree selected and provided for sale to consumers the WanaBana Defendants' Products that contained lead. The Products which contained lead posed a clear and present danger to all foreseeable consumers, including children and Plaintiffs.

202.  At all pertinent times, Defendant Dollar Tree had a duty of a reasonably prudent and careful seller of the Products to take precautions and appreciate risks of harm associated with the ordinary use of the Products, in light of the risks associated with the Products and lead ingestion.

203.  At all pertinent times, Defendant Dollar Tree had a duty to exercise reasonable care to consumers, including to Plaintiffs, to properly promote, market, distribute, and sell the Products.

204.  At all pertinent times, Defendant Dollar Tree owed a duty of due care to consumers, including Plaintiffs, as a foreseeable user of the Products, that it would be reasonably safe for all intended uses and free from defects.

205.  At all pertinent times, Defendant Dollar Tree knew or should have known in the exercise of reasonable care that use of the Products which contained lead significantly increases the risk of lead poisoning and the detrimental effects therefrom, especially to children.

206.  At all pertinent times, Defendant Dollar Tree knew or in the exercise of reasonable care should have known that the WanaBana Defendants were not providing warnings to the consumers of the Products concerning the risk of lead ingestion and poisoning associated with the Products. Thus, Defendant Dollar Tree had a duty to warn its customers, including Plaintiffs, of a known and foreseeable risk.

207.  Defendant Dollar Tree breached its duty to Plaintiffs by failing to include information in relation to the increased risk of lead ingestion and lead poisoning caused by the Products. Defendant Dollar Tree was grossly negligent as defined by Florida Statutes Chapter 768, Section

72, in that they acted reckless and in conscious disregard or indifference to the life, safety, or rights of persons exposed to the WanaBana products they provided for sale.

208.   Defendant Dollar Tree's gross negligence was a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisoning. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

209.   As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore**, Plaintiffs request a judgment against Defendants jointly and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

## COUNT FIVE – WanaBana Defendants–Negligence

210.   All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

211.   At all pertinent times, the WanaBana Defendants had a duty to reasonably and properly design, manufacture, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings and prepare for use the Products, as a reasonably prudent and careful manufacturer. The WanaBana Defendants owed this duty to Plaintiffs.

212.  At all pertinent times, the WanaBana Defendants knew or in the exercise of reasonable care should have known that the Products were not properly designed, manufactured, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared and/or provided with the proper warnings, and was unreasonably likely to injure users and consumers, including Plaintiffs L.D.1 and L.D.2. The WanaBana Defendants' conduct created a foreseeable risk of injury to Plaintiffs and all of its customers.

213.  The WanaBana Defendants breached their duty by, among other things:

a.  Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, advertisement, marketing, promotion, distribution, and/or sale of the Products;

b.  Failing to warn Plaintiffs of the hazards associated with the use of the Products, including the risk of ingesting lead and being lead poisoned after consuming the Products;

c.  Failing to properly test the Products to determine the adequacy and effectiveness or safety measures, if any, prior to release for consumer use;

d.  Failing to warn Plaintiffs that the Products contained lead;

e.  Choosing a supplier that intentionally added lead to the product to increase the weight, and consequently, the value of the cinnamon;

f.  Failing to properly test and/or conduct a quality control of the Products to determine the increased risk of children being lead poisoned from normal and/or intended use;

g.  Failing to adequately test the Products to ensure the absence of lead contamination;

h.  Failing to inform ultimate users, such as Plaintiffs as to the safe and proper consumption of the Products;

i.   Failing to remove Products from the market or adding proper warnings when the WanaBana Defendants knew or in the exercise of reasonable care should have known the Products were defective;

j.   Failing to instruct the ultimate user, such as Plaintiffs, as to the methods of reducing the type of exposure to Products which led to an increased risk of lead poisoning; and

k.   Marketing and labeling the Products as safe for all uses despite knowledge to the contrary and/or lack of testing to support their marketing and labeling claims.

214.   The WanaBana Defendants' foregoing conduct was negligent and in breach of their duty to Plaintiffs, and a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

215.   As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants jointly and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

## COUNT SIX– Defendant Dollar Tree –Negligence

210.   All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

211.   Defendant Dollar Tree is engaged in the business of selling low-cost food products. Their business model is designed to maximize its profits as a retailer, and the Products are one such example of Defendant Dollar Tree's low-quality food products sold for a large financial return.

212.   In so doing, Defendant Dollar Tree selected and provided for sale to consumers Defendant WanaBana's products that contained lead.

213.   At all pertinent times, Defendant Dollar Tree had a duty of a reasonably prudent and careful seller of the Products to take precautions and appreciate risks of harm associated with the ordinary use of the Products, in light of the risks associated with the Products and lead ingestion.

214.   At all pertinent times, Defendant Dollar Tree had a duty to exercise reasonable care to consumers, including to Plaintiffs, to properly promote, market, distribute, and sell the Products.

215.   At all pertinent times, Defendant Dollar Tree owed a duty of due care to consumers, including Plaintiffs, as a foreseeable user of the Products, that it would be reasonably safe for all intended uses and free from defects.

216.   At all pertinent times, Defendant Dollar Tree knew or should have known in the exercise of reasonable care that use of the Products which contained lead significantly increases the risk of lead poisoning and the detrimental effects therefrom, especially to children.

217.   At all pertinent times, Defendant Dollar Tree knew or in the exercise of reasonable care should have known that the WanaBana Defendants were not providing warnings to the consumers of the Products concerning the risk of lead ingestion and poisoning associated with the Products.

Thus, Defendant Dollar Tree had a duty to warn its customers, including Plaintiffs, of a known and foreseeable risk.

218. Defendant Dollar Tree breached its duty to Plaintiffs by failing to include information in relation to the increased risk of lead ingestion and lead poisoning caused by the Products.

219. Defendant Dollar Tree's negligence was a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisoning. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

220. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore**, Plaintiffs request a judgment against Defendants jointly and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

### COUNT SEVEN – Dollar Tree Defendant – Strict Seller Liability

221. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

222.  Defendant Dollar Tree, at all times pertinent, engaged in the business of selling and distributing the Products to consumers nationwide, including in the States of Florida and North Carolina and Miami-Dade County.

223.  Defendant Dollar Tree, upon information and belief, did and continues to derive substantial revenue in the State of Florida for the sale of WanaBana Defendants' fruit puree pouches, including the Products at issue here.

224.  At all pertinent times, the Products were defective at the time of sale to the ultimate consumer, like Plaintiffs, as the Products were unreasonably dangerous due to their inclusion of lead.

225.  At all pertinent times, the Products were defective as the foreseeable risk of ingesting lead and lead poisoning as a result exceeds a reasonable consumer's expectations when used by children as food and is defective in design because the risk of lead exposure significantly outweighs any potential benefit.

226.  The Products are defective as the packaging failed to include an adequate warning regarding the risk of lead exposure. Upon information and belief, Defendant Dollar Tree advertised and continues to sell the Products, displaying the fruit puree pouches' packaging which purports to be "just fruit" with no additives. Defendant Dollar Tree's website offers no warnings or details as to the potential harm associated with ingesting lead-containing fruit puree pouches.

227.  Defendant Dollar Tree knew or should have known that the presence of lead in the Products significantly increases the risk of lead ingestion and lead poisoning based upon extensive scientific knowledge dating back to the 1970s.

228.  At all times pertinent, the Products were expected to and did reach the consumers, including Plaintiffs, without substantial change from the condition in which they were sold. The

condition in which the Products reach Plaintiffs was one that Plaintiffs did not contemplate, in that they did not expect that the use of the Products would result in lead exposure and lead poisoning. Thus, the Products failed Plaintiffs' expectations as consumers.

229. Defendant Dollar Tree's acts and omissions, as alleged herein, were a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

230. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

## COUNT EIGHT – Dollar Tree Defendant – Breach of Express Warranty

231. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

232. Defendant Dollar Tree expressly warranted, through direct-to-consumer marketing, social media, advertising, packaging and labeling, that the Products were safe and effective for all reasonably anticipated uses, including for ingestion by children. Plaintiffs L.D.1 and L.D.2 were

people whom the Dollar Tree Defendant would reasonably have expected to use, consume, and/or be affected by the Products and who did use and consume it.

233.  Plaintiffs saw these advertisements and packaging, including at a retail location owned and operated by Defendant Dollar Tree, and believed the Products were safe and effective for L.D.1 and L.D.2 to consume, leading them to rely on the Products' advertisements and packaging.

234.  Plaintiffs are in privity with Defendant Dollar Tree because it directly sold the Products to Plaintiffs.

235.  The Products are good as defined by U.C.C. § 2-105 and Defendant Dollar Tree knew or had reason to know of the specific use for which the Products, as good, are purchased.

236.  The Products were defective because it did not conform to these express representations in violation of FLA. STAT. ANN. § 672.212, as well as Florida common law, because the Products were unsafe for the reasonably foreseeable use and consumption of L.D.1 and L.D.2, due to the increased risk of lead ingestion and lead poisoning when consumed.

237.  As detailed above, Defendant Dollar Tree, through the written packaging, labeling, and advertising related to the Products expressly warranted that its Products were safe and fit for the purposes intended, that they were merchantable quality, that they were healthy and safe for human consumption, and that they did not pose dangerous health risks.

238.  Plaintiffs Nicole Peterson and Thomas Duong read and relied on these express warranties provided by Defendant Dollar Tree, including that the Products contained only cinnamon and apples, no added sugar, no gluten, no BPAs, and no preservatives. Plaintiffs believed, based on the Defendant Dollar Tree's representations, that the Products were safe and health for their Minor Children L.D.1 and L.D.2.

239.  Defendant Dollar Tree breached its express warranties because the Products were not reasonably safe for their ordinary and intended purpose of providing Plaintiffs and consumers with safe and health food for their children. Instead, the Products contained lead, which is harmful to children and adults, not fit for human consumption, and not conforming to the Products' packaging.

240.  Defendant Dollar Tree breached its express warranties by selling Products that contain lead.

241.  The presence of lead rendered the Products unfit for their intended use and purpose and substantially impaired the use and value of the Products.

242.  Defendant Dollar Tree was on notice of this breach, as it was aware or should have been aware of the inclusion of lead in the Products.

243.  Defendant Dollar Tree's  actions, as complained of herein, breached the warranties that the Products were of merchantable quality and fit for such use.

244.  Defendant Dollar Tree's intended beneficiaries of these express warranties were ultimately consumers such as Plaintiffs, not third-party retailers, resellers, or distributors who sold the Products. Moreover, the Dollar Tree Defendant exercises substantial control over which retail locations can carry and sell the Products, which are the same outlets that Plaintiffs purchased the Products. In addition, the Dollar Tree Defendant's warranties are in no way designed to apply to third-party retailers, resellers, or distributors who purchase the Products in bulk and then sell them on an individual basis to consumers. Individual consumers are the ones who ultimately review the Product labels prior to making any purchasing decisions. Accordingly, these warranties are specifically designed to benefit the individual consumers who purchased the Products.

245.  Defendant Dollar Tree's breach of express warranty was a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily

45

injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

246. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

### COUNT NINE – WanaBana Defendants – Breach of Express Warranty

247. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

248. The WanaBana Defendants expressly warranted, through direct-to-consumer marketing, social media, advertising, packaging and labeling, that the Products were safe and effective for all reasonably anticipated uses, including for ingestion by children. Plaintiffs L.D.1 and L.D.2 were people whom the WanaBana Defendants would reasonably have expected to use, consume, and/or be affected by the Products and who did use and consume it.

249. Plaintiffs saw these advertisements and packaging, including at a Dollar Tree retail location, and believed the Products were safe and effective for L.D.1 and L.D.2 to consume, leading them to rely on the WanaBana Defendants advertisements and packaging.

250. Plaintiffs are in privity with the WanaBana Defendants because the WanaBana Defendants directly sold the Products to Plaintiffs via authorized retailers.

251. The Products are good as defined by U.C.C. § 2-105 and Defendants know or have reason to know of the specific use for which the Products, as good, are purchased.

252. The Products were defective because it did not conform to these express representations in violation of FLA. STAT. ANN. § 672.212, as well as Florida common law, because the Products were unsafe for the reasonably foreseeable use and consumption of L.D.1 and L.D.2, due to the increased risk of lead ingestion and lead poisoning when consumed.

253. As detailed above, the WanaBana Defendants, through its written packaging, labeling, and advertising expressly warranted that its Products were safe and fit for the purposes intended, that they were merchantable quality, that they were healthy and safe for human consumption, and that they did not pose dangerous health risks.

254. Plaintiffs Nicole Peterson and Thomas Duong read and relied on these express warranties provided by the WanaBana Defendants, including that the Products contained only cinnamon and apples, no added sugar, no gluten, no BPAs, and no preservatives. Plaintiffs believed, based on the WanaBana Defendants' representations, that the Products were safe and health for their Minor Children L.D.1 and L.D.2.

255. The WanaBana Defendants breached their express warranties because the Products were not reasonably safe for their ordinary and intended purpose of providing Plaintiffs and consumers with safe and health food for their children. Instead, the Products contained lead, which is harmful to children and adults, not fit for human consumption, and not conforming to the Products' packaging.

47

256. The WanaBana Defendants breached their express warranties by selling Products that contain lead.

257. The presence of lead rendered the Products unfit for their intended use and purpose and substantially impaired the use and value of the Products.

258. The WanaBana Defendants were on notice of this breach, as they were aware or should have been aware of the inclusion of lead in the Products.

259. The WanaBana Defendants' actions, as complained of herein, breached the warranties that the Products were of merchantable quality and fit for such use.

260. The WanaBana Defendants' intended beneficiaries of these express warranties were ultimately consumers such as Plaintiffs, not third-party retailers, resellers, or distributors who sold the Products. Moreover, the WanaBana Defendants exercise substantial control over which outlets can carry and sell their Products, which are the same outlets that Plaintiffs purchased the Products. In addition, the WanaBana Defendants' warranties are in no way designed to apply to third-party retailers, resellers, or distributors who purchase the Products in bulk and then sell them on an individual basis to consumers. Individual consumers are the ones who ultimately review the Product labels prior to making any purchasing decisions. Accordingly, these warranties are specifically designed to benefit the individual consumers who purchased the Products.

261. The WanaBana Defendants' breach of express warranty was a substantial contributing factor of Plaintiffs L.D.1 and L.D.2's lead poisonings. As a result, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and

loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

262.  As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

### COUNT TEN – All Defendants – Negligent Misrepresentation

263.  All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

264.  Defendants, as manufacturers and sellers of the Products at issue here, owed a duty to the consuming public in general, and to the Plaintiffs in particular, to exercise reasonable care to design, test, manufacture, inspect, label, advertise, market, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

265.  Defendants' Products contained lead.

266.  Exposure to lead has been linked with an increased risk of health problems, particularly for children.

267.  Given the established and documented dangerous nature of lead, the presence of lead in Defendants' Products is a material fact about the safety of the Products.

268.  Given the established and documented dangerous nature of lead, the presence of lead in Defendants' Products renders them unsafe, unhealthy, and unfit for human consumption.

269.  As set forth fully above, Defendants made numerous misrepresentations and omissions about the health, safety, and nutrition of their Products on its advertising and labeling.

270.  Defendants touted the health, safety, and nutrition of their products, including the limited ingredients and lack of preservatives or BPAs in their Products, with the intention of inducing confidence and driving consumers, including Plaintiffs, to purchase the Products.

271.  Defendants knew that consumers, including Plaintiffs, would rely on these misrepresentations in making the decision to purchase their Products.

272.  Such representations were materially false given the presence of lead in Defendants' Products.

273.  Defendants knew that reliance on these representations could result in loss or injury.

274.  Defendants omitted and/or concealed from its labeling, marketing, and advertising the material fact that lead was present in their Products.

275.  Because of the false and misleading claims by Defendants, Plaintiffs Nicole Peterson and Thomas Duong were unaware that Defendants' Products contained toxic lead. Plaintiffs Nicole Peterson and Thomas Duong fed Defendants' Products to their Minor Children L.D.1 and L.D.2 on the belief that Defendants' labeling and sale of Products was accurate and that the Products were unadulterated and safe for consumption.

276.  Plaintiffs relied on Defendants' misrepresentations and omissions on the Products' packaging, which was prepared, reviewed, and/or approved by Defendants and disseminated by Defendants throughout the United States.

277.  Plaintiffs did in fact justifiably rely on Defendants' representations in deciding to buy the products and feed the products to Minor Children L.D.1 and L.D.2.

278.  Plaintiffs believed that they were allowing L.D.1 and L.D.2 to consume a high-quality, additive-free, safe, and nutritious pureed fruit product from Defendants. '

279.  Plaintiffs relied on the nutritional and safety claims on the packaging of the Products prior to allowing L.D.1 and L.D.2 to consume the Products.

280.  Plaintiffs would not have fed L.D.1 and L.D.2 the Defendants' Products had they known that there was a risk that the Products may contain lead.

281.  As a result, Plaintiffs Minor Children L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

282.  As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expenses of testing, treatment, and medical and nursing care of their Minor Children and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

**COUNT ELEVEN – WanaBana Defendants – Fraudulent Misrepresentation**

283.   All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

284.   In the course of business, the WanaBana Defendants designed, manufactured and sold the Products, knowing it was reasonable and foreseeable that children and consumers would consume the Products.

285.   At all relevant times, the WanaBana Defendants intentionally, willfully, and/or recklessly, with the intent to deceive, misrepresented and/or concealed material facts to consumers, including Plaintiffs.

286.   At all relevant times, the WanaBana Defendants misrepresent and/or concealed material facts concerning the Products to consumers, including Plaintiffs, with knowledge of the falsity of their misrepresentations.

287.   The WanaBana Defendants were aware of the dangerous and defective condition of the Products and intentionally withheld this information from Plaintiffs, the healthcare field, and the general public even though these significant dangers were not readily obvious to ordinary users.

288.   At all pertinent times and upon information and belief, the misrepresentations and concealments made by the WanaBana Defendants concerning the Products include, but are not limited to the following:

i.   Falsely labeling and advertising the Products: "I am fruit."

ii.   Knowingly misrepresenting to Plaintiffs and the public, through the advertisements described above, that the Products is safe for consumption;

iii.   Intentionally failing to disclose that the Products contain lead on its packaging;

iv.   Intentionally failing to issue statements on its United States social media pages which inform consumers of the recall of its Products;

     v.  Intentionally failing to include adequate warnings with the Products regarding the potential and actual risks of consuming the Products which contain lead;

    vi.  Despite the WanaBana Defendants' knowledge regarding the harmful effects of lead poisoning, particularly in children, the WanaBana Defendants falsely marketed, advertised, labeled and sold the Products as safe for public consumption and usage, including for ingestion by children.

289.  Plaintiffs justifiably relied upon the aforementioned misrepresentations and concealments by the WanaBana Defendants and the Minor Children L.D.1 and L.D.2 consumed the Products as described herein for several months.

290.  The WanaBana Defendants' fraudulent misrepresentations directly and in natural and continuous sequence produced and contributed substantially to Plaintiffs' reliance on the WanaBana Defendants' fraudulent misrepresentations and concealments, Plaintiffs L.D.1 and L.D.2 were seriously and permanently injured.

291.  The WanaBana Defendants' fraudulent misrepresentations directly and proximately produced and contributed substantially to Plaintiffs' reliance, from which Minor Children L.D.1 and L.D.2 sustained damages including injuries and illnesses and were deprived of the opportunity of informed free choice in connection with the purchase, use of and exposure to the Products.

292.  As a direct and proximate result of Plaintiffs' L.D.1 and L.D.2's ingestion of the Products, L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring, loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

293. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

294. The conduct of the WanaBana Defendants in continuing to market, promote, sell and distribute the Products while fraudulently concealing knowledge that the Products were failing and performing as represented and intended, shows a complete indifference to, or conscious disregard for the safety of consumers, including Plaintiffs.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

## COUNT TWELVE –All Defendants – Violation of Florida's Deceptive and Unfair Trade Practices Act (FLA. ANN. STAT. §§ 501.201 *et seq.*)

295. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

296. At all pertinent times, Defendants engaged in deceptive trade practices, in violation of Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA") Fla. Ann. Stat. §§ 501.201 *et seq.*

297. Florida has enacted statutes to protect consumers from deceptive, fraudulent, and unconscionable trade and business practices. Defendants violated these statutes by knowingly and falsely representing that the subject Products were fit to be used for the purpose for which it was intended, when Defendants knew it was defective and dangerous, in the manufacturing, distributing, marketing, promoting, and sale of the Products in the following ways:

vii. Representing that the Products contained "only fruit;" and were nutritional foods for children to ingest when the purported benefits of such usage were disproportionately outweighed by the significant increase in the likelihood of lead poisoning when consumed.

viii. Representing that the Products are of a particular standard or quality, purportedly safe for consumers and children to ingest, when Defendants knew or in the exercise of reasonable care should have known that such use would lead to significant increased likelihood of lead poisoning;

ix. Continuing to advertise the Products as safe, when Defendants have known that lead exposure and poisoning, particularly in children, can pose significant health and developmental issues.

x. Consistently engaging in advertising campaigns in print and on the web promoting the purported health and nutritional benefits of the Products when consumed, promoting confusion as Product testing and health agencies say otherwise.

xi. Otherwise engaging in practices that are unfair and/or deceptive to consumers, including Plaintiffs.

298. As a direct and proximate result of Defendants' deceptive trade practices in the marketing, promoting, selling, distributing, advertising, and offering for sale the Products to consumers, Plaintiffs were harmed. Had Plaintiffs received a warning that the use of the Products would expose their Minor Children L.D.1 and L.D.2 to lead, Plaintiffs would not have purchased or used the Products. Plaintiffs L.D.1 and L.D.2's use of the Products proximately caused their lead poisoning.

299. As a direct and proximate result of Defendants' design, manufacture, marketing, sale and distribution of the Products, Plaintiffs Minor Children L.D.1 and L.D.2 suffered bodily injuries

and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring, loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

300. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

### COUNT THIRTEEN –All Defendants – Unjust Enrichment

301. All of the allegations contained in the foregoing paragraphs are incorporated and realleged herein.

302. Plaintiffs Nicole Peterson and Thomas Duong and other consumers conferred a monetary benefit on Defendants, and Defendants had knowledge of this benefit.

303. By its wrongful acts and omissions described herein, including selling the Products containing lead, Defendants were unjustly enriched at the expense of Plaintiffs and consumers.

304. Plaintiffs' detriment and Defendants' enrichment were related to and flowed from the wrongful conduct alleged herein.

305. Defendants have profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs under circumstances in which it would be inequitable for Defendants to

retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the Products.

306. Plaintiffs have been damaged as a direct and proximate result of Defendants' unjust enrichment because they would not have purchased the Products had they known that the Products contained lead.

307. Defendants either knew or should have known that payments rendered by Plaintiffs and other consumers were given and received with the expectation that the Products were free of lead. It is inequitable for Defendants to retain the benefit of payments under these circumstances.

308. Plaintiffs are in privity with Defendants because Defendants either directly sold the Products to Plaintiffs via authorized retailers or directly sold to Plaintiffs as an authorized retailer.

309. As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, Plaintiffs are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendants for their inequitable and unlawful conduct.

310. As a result, Plaintiffs Minor Children L.D.1 and L.D.2 suffered bodily injuries and resulting pain and suffering, disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life in the past and in the future and will incur the expense of hospitalization, medical and nursing care and treatment, medical monitoring, loss of earnings, and loss of ability to earn money in the future. The losses are permanent or continuing and Plaintiffs Minor Children L.D.1 and L.D.2 will suffer the losses in the future.

311. As a further result, Plaintiffs Nicole Peterson and Thomas Duong have incurred the expense of testing, hospitalization, and medical and nursing care and treatment of their minor child and will continue to suffer such losses in the future.

**Wherefore,** Plaintiffs request a judgment against Defendants joint and severally for compensatory and economic damages, together with interest, costs of suit, attorneys' fees and such further and other relief this Court deems just and appropriate and demands trial by jury of all issues raised herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

a. In favor of Plaintiff and against all Defendants, for damages in such amounts as may be proven at trial;

b. Compensation for compensatory damages in excess of the jurisdictional amount, including, but not limited to mental pain and suffering, emotional distress, and all other-noneconomic damages in an amount to be determined at trial of this action.

c. Awarding economic damages in the form of medical expenses, future medical expenses, chelation treatment, nutritional consulting, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at a trial of this action;

d. Awarding restitution and disgorgement of revenues as appropriate;

e. Attorney's fees and costs;

f. Pre-judgment interest;

g. Post-judgment interest;

h. Statutory damages as available'

i. Awarding Plaintiffs the cost of these proceedings; and

j. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.


Dated: January 25, 2024                      Respectfully Submitted,

                                             By: /s/ *Lance Oliver*
                                             Lance Oliver, Esq.
                                             Florida Bar No. 96085
                                             Carmen S. Scott, Esq. (PHV Forthcoming)
                                             Nicholas V. Williams, Esq. (PHV Forthcoming)
                                             **MOTLEY RICE LLC**
                                             28 Bridgeside Blvd.
                                             Mt. Pleasant, SC 29464
                                             (843) 216-9000